IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| MICHELLE O'ROURKE, *as next of kin and Personal Representative of the Estate of Amanda Jackson.*<br><br>*Plaintiff,*<br><br>PUTNAM COUNTY, TENNESSEE; QUALITY CORRECTIONAL HEALTH CARE, PLLC; JOHNNY BATES; LAURIE GRAVES, VICTORIA KAVANAUGH; LAURIE EHRENFELD; *and* JESSICA OAKLEY<br><br>*Defendants.* | Case No.<br><br>JURY DEMANDED |

# COMPLAINT

Comes now the Plaintiff, Amanda Jackson, by undersigned counsel and for her complaint against the Defendants states the following:

## Introduction

1. This is a civil rights action brought by Plaintiff, as the next of kin and personal representative of the Estate of Amanda Lynnette Jackson, who died on September 25, 2023, while in custody at the Putnam County Jail. Plaintiff brings this action against the above-named Defendants for their deliberate indifference to Amanda Jackson's serious medical needs, resulting in her wrongful death, in violation of the Eight and Fourteenth Amendments to the United States Constitution.

## Jurisdiction and Venue

2. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 with

1

this Complaint arising under a violation of rights conferred by federal statutes and the Constitution of the United States of America.

3. Jurisdiction of this Court is invoked under 28 U.S.C. § 1343(a)(3) because this action seeks redress for a deprivation, under color of state law, of rights secured to Plaintiff by the Fourteenth Amendment to the Constitution of the United States of America.

4. Jurisdiction of this court is invoked under 28 U.S.C. § 1367(a) because this Court has original jurisdiction over the federal claims, and therefore has supplemental jurisdiction over the related state law claims of medical malpractice.

5. Plaintiff asserts claims for relief under 42 U.S.C. § 1983, which authorizes action to redress the deprivation, under color of state law, of rights, privileges, or immunities secured to Plaintiff by the Constitution or laws of the United States of America and 42 U.S.C. § 1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought under 42 U.S.C. § 1983.

6. This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because one or more defendants reside in this judicial district. Additionally, a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## Parties

7. Plaintiff Michelle O'Rourke is the personal representative and next of kin for the decedent Amanda Jackson because she is Amanda Jackson's mother; Amanda Jackson was unmarried at the time of her death; and Amanda Jackson had no children.

Also, Michelle O'Rourke was appointed as the personal representative by the Putnam County Probate Court on April 23, 2024.

8. Decedent Amanda Jackson was an adult resident of Putnam County, Tennessee. She was 31 years old at the time of her death on September 25, 2023.

9. Defendant Putnam County is a political subdivision of the State of Tennessee. Putnam County operates the Putnam County Jail.

10. Defendant Quality Correctional Health Care, PLLC ("QCHC") is a limited liability company whose principal place of business is located at 200 Narrows Pkwy, Suite A Birmingham, Alabama 35242.

11. Defendant Johnny Bates, MD, is the CEO of QCHC and overseeing physician for all providers serving Putnam County Sheriff's Office.

12. Defendant Laurie Graves, LPN, was an attending provider for Amanda Jackson at the Putnam County Jail in September 2023 and is employed by QCHC.

13. Victoria Kavanaugh, RN, was an attending provider for Amanda Jackson at the Putnam County Jail in September 2023 and is employed by QCHC.

14. Laurie Ehrenfeld, RN, is a treatment provider for Amanda Jackson at the Putnam County Jail in September 2023 who is employed by QCHC.

15. Jessica Oakley, RN, is a treatment provider for Amanda Jackson at the Putnam County Jail in September 2023 who is employed by QCHC.

## Factual Allegations

16. Amanda Jackson was, in September 2023, a 31-year-old woman on probation in Putnam County, Tennessee. She was arrested and charged with Violation

of Probation on September 21, 2023.

17. On September 21, 2023 Ms. Jackson was booked into the Putnam County Jail.

18. As part of the Putnam County Jail's intake process, Ms. Jackson was body scanned for contraband by guards using an x-ray machine. She was scanned twice and both results were abnormal.

19. As part of the Putnam County Jail's intake process, third-party medical contractors from QCHC performed a medical assessment on Ms. Jackson.

20. Ms. Jackson informed both the guards and QCHC medical personnel that she used drugs, including fentanyl, and that she expected to go into withdrawals.

21. Ms. Jackson was placed on medical observation, which required her to be held in booking under constant monitoring by medical staff and guards.

22. Between September 21, 2023 and September 22, 2023, Ms. Jackson was held in cell H7 with several other inmates.

23. Through September 21 and September 22, Ms. Jackson spent most of her time lying on the floor in her cell. She was capable of talking, standing, moving around, and communicating with guards and other inmates.

24. Defendant Victoria Kavanaugh directly observed Ms. Jackson, performed an assessment of her physical and mental condition, and signed off on notes concerning Ms. Jackson's medical status.

25. Based on her assessment of Ms. Jackson, Defendant Victoria Kavanaugh put in an order on September 22, 2023 at 12:28 pm for blood tests including a

Comprehensive Metabolic Panel, Comprehensive Blood Count, and a Fasting Lipid Profile.

26. The tests ordered by Defendant Kavanaugh on September 22 would have revealed Ms. Jackson's blood glucose levels.

27. The tests ordered by Defendant Kavanaugh on September 22 were never performed.

28. On September 23, 2023, Ms. Jackson's condition began to deteriorate. She wakes up around 2:38 am and vomits on the middle of the cell floor. Ms. Jackson is removed from the cell while her vomit is cleaned up, and when she returns to the cell, she is the only inmate in H7.

29. Throughout the day on September 23, 2023, Defendants Kavanaugh and Oakley both personally observed Ms. Jackson's condition and reviewed the notes of other QCHC providers in Ms. Jackson's file.

30. On September 23, 2023 at approximately 1:15 pm, Sgt. Brandi Nash and Deputy Shoemake entered Ms. Jackson's cell to take her to change into an inmate uniform.

31. Based on their observations of Ms. Jackson's physical and mental condition, Nash and Shoemake were concerned about Ms. Jackson's well-being. Ms. Jackson was disoriented, uneasy on her feet, and weak. Nash and Shoemake relayed these concerns to QCHC personnel and asked medical to come and check on Ms. Jackson.

32. A QCHC nurse came and checked Ms. Jackson vitals and told the

guards that she should be left in booking for medical observation while detoxing.

33. On September 23 at around 8:35 PM, Ms. Jackson was becoming more incoherent and less able to move. Deputy Brookelynn Hallum looked through the window in Amanda Jackson's cell and noticed a bloody rag in the floor. She entered the cell with Sgt. Kourtney Wilson and they observed Ms. Jackson's condition. Based on Ms. Jackson's deteriorating physical and mental condition, Hallum and Wilson recognized Ms. Jackson required immediate medical attention and they took Ms. Jackson from her cell to Defendant Ehrenfeld and Defendant Oakley for help.

34. Following Ms. Jackson's arrival at medical, Defendants Oakley and Ehrenfeld assessed Ms. Jackson's condition at around 9:00pm on September 23. They noted in Ms. Jackson's file that she was "unable to follow instruction" for the COWS test. At this time, both these defendants were aware of Ms. Jackson's previous mental and physical condition, as well as the fact that Ms. Jackson's condition had deteriorated since her admission into the jail. Despite this change in mental status and Ms. Jackson's continuing deterioration, neither Oakley nor Ehrenfeld sent Ms. Jackson to the hospital.

35. During this encounter, around 9:00pm on September 23, Defendant Oakley notified Defendant Graves of Ms. Jackson's deteriorating physical and mental condition, including symptoms which were both inconsistent with opiate withdrawal and which indicated an obvious need for hospital care including

vomiting, mental status change, weakness, inability to ambulate, and inability to hold down medication.

36. Defendant Graves and Defendant Oakley failed to conduct a meaningful evaluation of Ms. Jackson's mental status change, weakness, inability to ambulate, and inability to hold down medication. Defendant Graves simply added an anti-nausea medication to Ms. Jackson's opiate withdrawal protocol.

37. Throughout September 24, 2023, Ms. Jackson's physical and mental condition continued to deteriorate.

38. At approximately 2:32 am, guards observed Ms. Jackson's stupor and became concerned. Ms. Jackson fell while attempting to use the toilet and was unable to get back up from the floor. Two guards enter the cell, picked her up, and placed her on the bunk. They called Defendant Oakley for medical assistance.

39. At approximately 2:38 am on September 24, 2023, Defendant Oakley entered Ms. Jackson's cell and assessed her condition. Ms. Jackson was delirious and unable to stand on her own volition. Her condition was obviously serious and was not related to opiate withdrawal.

40. On September 24, 2023 at approximately 3:22pm, Defendant Ehrenfeld enters Ms. Jackson's cell for medication administration. Defendant Ehrenfeld observes Ms. Jackson in a complete stupor, unable to hold herself up while attempting to swallow medication. The condition Ms. Ehrenfeld observes Ms. Jackson in is objectively worse than her condition on September 21 and 22.

41. At approximately 6:27 PM on September 24, 2023, guards again became

concerned about Ms. Jackson's condition and entered the cell to help her. They cleaned up the cell and created a pallet on the floor for her because they were concerned that, given her disorientation, she may fall off the bunk and injure herself.

42. At approximately 7:00 pm on September 24, 2023, inmate Tammy Cox Jones was placed in the cell with Ms. Jackson.

43. At the time when Ms. Jones was placed in the cell, Ms. Jackson was hallucinating and wobbling when she attempted to move her arms or ambulate. Ms. Jackson was also babbling incoherently.

44. Ms. Jones alerted the guards and medical staff that Ms. Jackson's condition appeared to be serious.

45. At around 3:27 am on September 25, 2023, Defendant Kavanaugh entered Ms. Jackson's cell and observed her condition. Ms. Jackson was in a stupor and was crumpled on the floor pallet.

46. Ms. Jackson was unable to stand, sit, or control her limb movements and her condition was clearly visible to Defendants Kavanaugh, Oakley, and Graves on the jail's surveillance video feed. Ms. Jackson's visible condition at this time was worse than it had been throughout her stay in the Putnam County Jail.

47. At 3:27 am, Ms. Jackson was suffering from severe diabetic ketoacidosis.

48. If appropriate treatment is administered, diabetic ketoacidosis is unlikely to be fatal.

49. Defendant Kavanaugh did not call 911 or otherwise seek immediate emergency care for Ms. Jackson immediately following the 3:27 pm encounter on

September 25, 2024.

50. Instead, Defendant Kavanaugh continued her medication administration rounds to other inmates.

51. At approximately 4:22 am on September 25, 2023, Defendant Kavanaugh and Defendant Oakley returned to Ms. Jackson's cell and found her in a completely non-responsive state. They finally sought emergency treatment for Ms. Jackson at this time.

52. Ms. Jackson was pronounced dead on arrival at Cookeville Regional Medical Center at 5:11 a.m. on September 25, 2023.

53. Following Amanda Jackson's death, on September 25, 2023, Defendant Ehrenfeld logged in to Amanda Jackson's patient file and deleted records of an encounter that had been recorded on September 24, 2023, at 4:53pm.

54. None of the medications administered to Ms. Jackson were prescribed to treat the stupor and delirium observed by Defendants Kavanaugh, Ehrenfeld, or Oakley and they all knew this fact when they observed her between September 23, 2023 and September 25, 2023.

55. Defendants Kavanaugh, Ehrenfeld, and Oakley knew or should have known that Ms. Jackson was not receiving treatment for whatever was causing her stupor, mental confusion, or inability to walk and that these symptoms required the kind of care that can only be provided in a hospital.

56. Ms. Jackson's stupor, mental confusion, and inability to walk were so objectively serious that guards intervened and contacted medical staff on multiple occasions.

57. If Ms. Jackson had received the tests Defendant Kavanaugh ordered on September 22, 2023, the results would have immediately resulted in detection of her condition and would have necessitated emergency care.

58. If Defendants Kavanaugh, Ehrenfeld, or Oakley had sought emergency care for Ms. Jackson immediately following their encounters with her at or prior to the 3:27 am encounter on September 25, 2023, Ms. Jackson would not have died from diabetic ketoacidosis.

59. Defendant Johnny Bates is the physician responsible for overseeing the practices of QCHC nurses including Defendants Kavanaugh, Ehrenfeld, and Oakley.

60. Defendant Johnny Bates is also the CEO of QCHC and is the person responsible for all policies and procedures in place governing the operation of QCHC facilities including the Putnam County Jail.

61. QCHC and Defendant Bates are delegated with final policymaking authority by Putnam County over the provision of medical care to inmates at the Putnam County Jail by contract and local legislative enactment.

### COUNT I: VIOLATION OF THE RIGHT TO DUE PROCESS
### FOURTEENTH AMENDMENT – FAILURE TO PROVIDE CONSTITUTIONALLY ADEQUATE MEDICAL CARE
### 42 U.S.C § 1983
### (All Defendants)

62. All of the actions and omissions committed by Defendants Bates, Kavanaugh, Ehrenfeld, and Oakley, were taken under color of state law because they were each acting under the authority given to them by the government and their acts and omissions were committed within the exercise of their official authority,

responsibility, or duties.

63. The constitutional rights afforded to prisoners who have been convicted of any criminal offense under the Eighth Amendment's Cruel and Unusual Punishment Clause extend to pretrial detainees under the Due Process Clause of the Fourteenth Amendment.

64. The Fourteenth Amendment to the United States Constitution requires that pretrial detainees be provided constitutionally adequate medical care while in the custody of any government entity.

65. Amanda Jackson's visible symptoms and deteriorating condition presented an objectively serious medical need that even a lay person would recognize as necessitating immediate treatment.

66. Defendants Graves, Kavanaugh, Ehrenfeld, and Oakley knew or reasonably should have known of Amanda Jackson's serious need for emergency medical care due to her visible, obvious physical and mental disfunction and her deteriorating condition.

67. By failing to provide hospital treatment for Ms. Jackson's serious symptoms Defendants Graves, Kavanaugh, Ehrenfeld, and Oakley failed to take reasonable measures to abate the risk posed to Ms. Jackson.

68. Defendants Graves, Kavanaugh, Ehrenfeld, and Oakley knew or had reason to know that failure to provide Amanda Jackson with emergency care created a substantial risk of harm and risk to life.

69. Within the meaning 42 U.S.C. § 1983, Quality Correctional Health Care

acted under color of state law in providing medical care to pre-trial detainees.

70. Putnam County is liable for the policies, practices, and customs of Quality Correctional Healthcare, because Putnam County delegated final decision-making authority to Quality Correctional Healthcare concerning the provision of medical care to inmates at the Putnam County Jail.

71. Defendants Putnam County and Quality Correctional Healthcare exhibited deliberate indifference to Decedent Jackson's serious medical needs by:

   a) Maintaining policies, practices, and/or customs whereby medically necessary tests identified upon an inmates admission are ignored, including the tests which were ordered for Amanda Jackson but were never administered.

   b) Maintaining policies, practices, and customs that allow and cause medical personnel to provide inadequate non-emergency responses to life threatening conditions;

   c) Failing to train nurses regarding the monitoring and protocol for treating non-drug-related medical emergencies in inmates suffering from drug withdrawal including when to send inmates to the hospital for emergency care.

72. Putnam County and QCHC are liable for deliberate indifference based on their above-described failure to train medical staff.

73. Putnam County and QCHC are liable for deliberate indifference based on their above-described failure to provide emergency medical care to inmates.

74. Within the meaning 42 U.S.C. § 1983, Johnny Bates, as CEO of QCHC, acted under color of state law in providing medical care to pre-trial detainees at the Putnam County jail.

75. Defendant Johnny Bates exhibited deliberate indifference to Amanda Jackson's serious medical needs by:

   a) Maintaining policies, practices, and/or customs whereby medically necessary tests identified upon an inmates admission are ignored and/or delayed, including the tests which were ordered for Amanda Jackson but were never administered.

   b) Maintaining policies, practices, and/or customs that allow and cause medical personnel to provide inadequate non-emergency responses to life threatening conditions;

   c) Failing to train nurses regarding the monitoring and protocol for treating non-drug-related medical emergencies in inmates suffering from drug withdrawal including when to send inmates to the hospital for emergency care.

76. Johnny Bates is a policymaker that is aware of, condoned, and facilitated by his inaction the conduct of Defendants Kavanaugh, Ehrenfeld, and Oakley.

77. Defendant Johnny Bates is liable for deliberate indifference based on his above-described failure to train QCHC medical staff.

78. Defendant Johnny Bates is liable on a theory of failure to train because he did not train QCHC staff including Defendants Kavanaugh, Ehrenfeld, and Oakley that

they should

79. As a result of the defendants' reckless disregard of Amanda Jackson's serious medical need, Amanda Jackson suffered injuries including pain and suffering, emotional distress, death, and pecuniary damages.

80. All of Amanda Jackson's injuries and damages were proximately caused by the County's unconstitutional customs, policies, and procedures.

### COUNT III: NEGLIGENCE PURSUANT TO TENNESSEE HEALTH CARE LIABILITY ACT, TENN. CODE ANN. § § 29-26-115 ET SEQ
### (DEFENDANT QUALITY CORRECTIONAL HEALTH CARE AND JOHNNY BATES ONLY)

81. Defendant Jonny Bates is a board-certified physician, and CEO of Quality Correction Health Care.

82. Defendants Laurie Graves, Victoria Kavanaugh, Laurie Ehrenfeld, Jessica Oakley, are licensed nurses who work for QCHC and who are also under the direct supervision of Defendant Bates.

83. QCHC contracts with Putnam County Jail to provide medical care for inmates, including Amanda Jackson.

84. Defendants Johnny Bates and QCHC owed a duty to inmates of the Putnam County Jail, including Amanda Jackson, to hire, train and supervise employees so that such employees provided adequate medical care to inmates at the Putnam County Jail

85. Defendants Johnny Bates and QCHC owed a duty to ensure all inmates, including Amanda Jackson, received adequate medical care in the Putnam County Jail.

86. Defendants Johnny Bates and QCHC failed to meet the standard of care

and violated their duty of care to Amanda Jackson through neglect. The medical negligence of Defendants includes but is not limited to the following acts and omissions:

a) Johnny Bates, as both the CEO and the physician overseeing QCHC nurses, is responsible for ensuring that all medical personnel under QCHC's contract, including Defendants Kavanaugh, Ehrenfeld, and Oakley, are adequately trained and supervised. Defendants Bates and QCHC failed to provide training or to implement policies in recognizing and responding to symptoms of serious medical conditions, such as a deterioration in mental status and unexplained onset of stupor, when an inmate is suffering from drug withdrawal.

b) QCHC and Bates failed to establish adequate intake screening and monitoring protocols such that medical tests ordered by a provider are actually performed or evaluated.

c) QCHC and Bates failed to ensure a protocol was in place that would have required medical staff to promptly and adequately respond to Amanda Jackson's evident physical and mental deterioration over several days. Despite multiple observations of Jackson's severe symptoms (vomiting, disorientation, stupor, inability to walk), QCHC staff took no action to escalate her care and send her to a hospital until she was dead.

d) QCHC and Bates failed to ensure that appropriate diagnostic tests, like those ordered by Kavanaugh initially, were actually performed

and reviewed. Had such tests been conducted in a timely manner, Ms. Jackson's condition could have been diagnosed earlier, and she would have received life-saving treatment.

87. A reasonable prudent supervising physician and contracting medical facility, operating under the same or similar conditions, would not have failed to provide the care as described in this Complaint. Each of the foregoing acts of negligence on the part of Defendants Johnny Bates and QCHC was a proximate cause of Amanda Jackson's death. Amanda Jackson's death was foreseeable to QCHC and Johnny Bates.

88. Defendants Johnny Bates and QCHC's conduct in breaching the duties owed to Amanda Jackson was negligent and/or reckless.

89. QCHC and Bates are vicariously liable for the negligent and/or reckless acts and/or omissions of the QCHC medical personnel involved in Ms. Jackson's treatment, including the conduct of Defendants Graves, Kavanaugh, Ehrenfeld, and Oakley described above.

90. As a direct and proximate result of such negligent and/or reckless acts and omissions, Amanda Jackson suffered injuries including pain and suffering, and death.[1]

## DAMAGES

91. As a direct and proximate result of the Defendants' violations of Amanda Jackson's federally protected rights and their reckless disregard to a serious medical

---

[1] The Sixth Circuit has ruled that obedience to the enhanced, state-law pleading procedures for medical malpractice is not required in federal court. *Albright v. Christensen*, 24 F.4th 1039 (6th Cir. 2022) (addressing Michigan's procedures); *Smith v. CoreCivic, Inc.*, 3:20-cv-563, 2022 WL 3051226, at *7 (M.D. Tenn. Aug. 2, 2022) (applying *Albright* to Tennessee's laws and concluding certificate of good faith not required in federal court).

need, Plaintiff requests damages for:

a) Pain and suffering

b) Physical and mental injuries

c) Loss of enjoyment of life

d) Reduced life expectancy

e) Serious mental suffering and emotional distress

92. Based on their intentional and reckless misconduct, Amanda Jackson requests an award of punitive damages against Defendants Graves, Kavanaugh, Ehrenfeld, and Oakley.

### REQUEST FOR RELIEF

Based upon all of the foregoing, Plaintiff requests:

I. Process be issued and that each Defendant be required to respond within the time provided by the Federal Rules of Civil Procedure;

II. A jury be empaneled to try this case;

III. That Plaintiff be awarded compensatory damages in an amount to be determined by a jury;

IV. That Plaintiff be awarded punitive damages against Defendants Graves, Kavanaugh, Ehrenfeld, and Oakley in an amount deemed appropriate by a jury;

V. That Plaintiff be awarded reasonable attorney's fees, costs, and expenses under 42 U.S.C. § 1988;

VI. For pre- and post-judgment interest on all damages awarded;

VII. For such other, further, and general relief as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Wesley Ben Clark*
Wesley Ben Clark, #32611
Frank Ross Brazil, #34586
Paul D Randolph, III #39667
BRAZIL CLARK, PLLC
2901 Dobbs Avenue
Nashville, TN 37211
615-730-8619
615-634-3651 (fax)
wesley@brazilclark.com
paul@brazilclark.com