UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| MICHELLE O'ROURKE, as next of kin and Personal Representative of the Estate of Amanda Jackson, | ) ) ) ) |
| Plaintiff, | ) NO. 2:24-cv-00067 ) |
| v. | ) ) |
| PUTNAM COUNTY, TN, et al., | ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This is a tragic case. Amanda Lynnette Jackson died on September 25, 2023, at the age of 31, while in custody at the Putnam County Jail. (Doc. No. 31 ¶¶ 1, 8). Understandably, her family is suing Putnam County—the owner and operator of Putnam County Jail (id. ¶ 9); Quality Correctional Health Care, PLLC ("QCHC")—the contractor that handles health care for the Putnam County Sheriff's Office, (id. ¶ 10); and a host of QCHC employees (id. ¶¶ 11-15). As relevant here, Ms. Jackson's Estate claims Putnam County violated 42 U.S.C § 1983 by maintaining policies, practices, or customs of deliberate indifference to prisoners' serious medical needs. (Id. ¶¶ 112-121). The County has moved to dismiss the Estate's § 1983 claim because: (1) ceding the medical care of prisoners to QCHC is not facially unconstitutional; (2) the Estate has not shown the County acquiesced in an unconstitutional practice; (3) the evidence of indifference alleged in the Complaint was too temporally remote from Ms. Jackson's death to be relevant; (4) a single episode of indifference to a prisoner's serious medical needs does not establish a custom or policy; and (5) the Estate's failure to train theory against the County fails because the Complaint does not establish the County's obligation to train the employees of a contractor. (Doc. Nos. 37, 38).

For the reasons that follow, the County's Motion to Dismiss will be denied.

I. BACKGROUND[1]

Ms. Jackson was arrested and charged with a violation of probation on September 21, 2023, and was booked into Putnam County Jail. (Doc. No. 31 ¶¶ 16, 17). At the time of her booking and medical assessment, Ms. Jackson informed both the guards and QCHC medical personnel that she used drugs, including fentanyl, and she expected to experience withdrawals. (Id. ¶ 21).

Between September 21 and September 22, Ms. Jackson spent most of her time lying on the floor in her cell. (Id. ¶ 24). On September 22 at 12:28 p.m., Ms. Jackson was assessed by a nurse. (Id. ¶ 26). That nurse ordered blood tests, including a Comprehensive Metabolic Panel, Comprehensive Blood Count, and a Fasting Lipid Profile. (Id.). Those tests, which would have revealed Ms. Jackson's elevated blood glucose levels, were never conducted. (Id. ¶¶ 27-28).

On September 23 at 2:38 a.m., Ms. Jackson vomited in her cell, was temporarily removed from her cell for clean-up and was returned to her cell without any medical treatment. (Id. ¶ 29). On September 23 at 1:15 p.m., two guards observed Ms. Jackson was "disoriented, uneasy on her feet, and weak." (Id. ¶¶ 31-32). The guards relayed their concerns to QCHC personnel. (Id. ¶ 32). A QCHC nurse told the guards to leave Ms. Jackson in the booking area for medical observation while detoxing. (Id. ¶ 33).

Around 8:35 p.m. on September 23, Ms. Jackson's condition further deteriorated, and two guards moved her for additional medical assessment. (Id. ¶ 34). She was assessed by QCHC nurses, who noted her deteriorating condition but prescribed her anti-nausea medicine rather than sending her to a hospital or ensuring any other tests were run. (Id. ¶¶ 35-37). Around 2:32 a.m.

---

[1] These facts are derived from the Amended Complaint, and are accepted as true, as they must be at this stage.

on September 24, two guards witnessed Ms. Jackson fall while trying to use the toilet. (Id. ¶ 39). After falling off the toilet, Ms. Jackson was unable to stand on her own. (Id.). The guards observed Ms. Jackson for several minutes and noted she was "delirious and unable to stand on her own volition." (Id. ¶ 40). They called a QCHC nurse; however, Ms. Jackson received no treatment and was placed back into her bunk by the guards. (Id.) Later that day at both 3:22 p.m. and 6:27 p.m., QCHC medical personnel and prison guards observed Ms. Jackson's rapid decline, including her inability to sit up to swallow medicine. (Id. ¶¶ 41-42). In fact, the prison guards made Ms. Jackson a pallet on the floor of her cell because they were afraid she would fall out of the bunk. (Id.).

At approximately 7:00 p.m., another inmate was placed in Ms. Jackson's cell and that inmate witnessed Ms. Jackson hallucinating, wobbling, and babbling incoherently. (Id. ¶ 43). The other inmate raised the alarm, but a QCHC nurse did not check on Ms. Jackson until 3:27 a.m. on September 25. (Id. ¶¶ 45-46). At that time, Ms. Jackson was in a stupor and laying crumpled on the floor. (Id.). Rather than seeking medical attention for Ms. Jackson at 3:27 a.m., the QCHC nurse continued her medical rounds. (Id. ¶¶ 50-51).

At 4:22 a.m., Ms. Jackson was discovered unresponsive and finally QCHC medical personnel sought emergency treatment. (Id. ¶ 52). Ms. Jackson was pronounced dead on arrival to the hospital at 5:11 a.m. (Id. ¶ 53). She died from diabetic ketoacidosis—a condition that if treated properly is "unlikely to be fatal." (Id. ¶ 48).

Two years before Ms. Jackson was taken to Putnam County Jail, Jody Simmons—a long-time QCHC employee and the Medical Administrator at the Putnam County Jail—reported troubling information about QCHC's history of deliberate indifference to two County officials:

3

Major Tim Nash,[2] who oversaw the corrections department, and Sheriff Eddie Farris. Specifically, Ms. Simmons told Major Nash and Sheriff Farris that at Putnam County Jail:

- Necessary medical procedures, including lab tests which were ordered during the patient's initial intake, were routinely delayed or not performed at all. (Id. ¶ 79).

- Nurses, who were tasked with high degree of autonomy and responsibility for inmate care, frequently failed to administer prescribed medications, complete chronic care treatments, or administer care to inmates who they found nonresponsive in their cells. (Id. ¶ 80).

- LNPs were not adequately trained to perform the care they were providing. (Id. ¶ 82).

Ms. Simmons also combed through inmate records and found specific examples of how QCHC's history of deliberate indifference adversely affected inmates' health. (Id. ¶ 82). Sheriff Farris did not investigate Ms. Simmons' assertions about widespread wrongdoing at Putnam County Jail. Instead, he met with QCHC executives, discussed Ms. Simmons' claims, and they collectively agreed to fire Ms. Simmons.[3] (Id. ¶ 91).

## II. LEGAL STANDARDS

When assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the Complaint's factual allegations as true, draw all reasonable inferences in Plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018) (citing Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). To survive a motion to dismiss, the complaint must contain "either direct or inferential allegations respecting all material elements to sustain a

---

[2] Ms. Simmon went to Mr. Nash first to report her concerns. (Doc. No. 31 ¶ 86). Mr. Nash, who was troubled by Ms. Simmons claims, set up a meeting between Ms. Simmons and Sheriff Eddie Farris. (Id. ¶ 87).

[3] When one hears of Ms. Simmons story, they are reminded of the adage "no good deed goes unpunished."

recovery under some viable legal theory." Eidson v. State of Tenn. Dept. of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." Id.

## III. ANALYSIS

Distilled to its essence, the County argues it is not liable for the actions of its contractor, QCHC, because the County did not have a custom, policy, or practice of elevating cost over care. At the motion to dismiss stage, the County's argument must be rejected. With the benefit of reasonable inferences, Ms. Jackson's Estate has adequately pled that the County knew about the serious issues with medical treatment at Putnam County Jail and that it adopted a practice of prioritizing low healthcare costs over the medical needs of the prisoners in its custody.

The Supreme Court "has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." Griffith v. Franklin Cnty., Kentucky, 975 F.3d 554, 566 (6th Cir. 2020). Both prisoners and pretrial detainees may sue for deliberate indifference to their serious medical needs. Convicted prisoners rely on the Eight Amendment, while pretrial detainees rely on the Fourteenth Amendment. Compare Estelle v. Gamble, 429 U.S. 97, 104 (1976) (holding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment" (citation omitted)), with Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004) ("Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment."). As a pretrial detainee, Ms. Jackson was entitled to medical care pursuant to the Fourteenth Amendment's Due Process Clause.

Deliberate indifference claims, like the one brought by Ms. Jackson's Estate, have two components: an objective one and a subjective one. The objective component is satisfied when a

5

prisoner is denied treatment for a "sufficiently serious" condition. Wilson v. Seiter, 501 U.S. 294, 298 (1991). A condition is sufficiently serious when it has been "diagnosed by a physician as mandating treatment or [it] is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Santiago v. Ringle, 734 F.3d 585, 590 (6th Cir. 2013). By contrast, the subjective component requires a prisoner to show that prison officials had a "sufficiently culpable state of mind" in denying them medical care. Wilson, 501 U.S. at 297. An official must have known of and disregarded "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 847 (1994)).

When prisoners or their families sue a municipality, as Ms. Jackson's Estate has done here, there is no subjective component because a county cannot have "subjective intentions." Daniels v. City of Hartford, Ala., 645 F. Supp. 2d 1036, 1057 (M.D. Ala. 2009). Municipal liability is established by showing that the municipality had an official "policy or custom" that was the moving force behind a violation of the plaintiff's constitutional rights, Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A county cannot "be sued under Section 1983 for an injury inflicted solely by its employees or agents." Id.; see also Burgess v. Fischer, 735 F.3d 462, 479 (6th Cir. 2013) (holding that Monell prohibits *respondeat superior* liability). To allege the existence of an illegal policy or custom, a plaintiff must assert sufficient facts to establish: (1) an illegal official policy or legislative enactment; (2) an official with final decision-making authority ratified an employee's illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.[4] Burgess, 735 F.3d at 478. While a municipality will rarely have a written policy

---

[4] "[W]hich theory [the plaintiff] ultimately pursues (or which theory can survive summary judgment) may largely depend on discovery" and what the evidence can show, but the Court "need

demonstrating deliberate indifference to a prisoner's medical needs, prisoners can still prevail if they show the municipality had "a clear and persistent pattern of" deliberate indifference. See Smith v. Cnty. of Lenawee, 505 F. App'x 526, 537 (6th Cir. 2012) (quoting Jones v. City of Cincinnati, 521 F.3d 555, 560 (6th Cir. 2008)). However, the custom "must be the moving force of the constitutional violation to establish the liability of the government body."[5] Id.

Therefore, to resolve Putnam County's motion to dismiss the Estate's municipal-liability claim, the Court must engage in a two-pronged inquiry: (1) whether the plaintiff asserted the deprivation of a constitutional right, and (2) whether the entity's official policy or custom is responsible for that deprivation. Cash v. Hamilton Cnty. Dep't. of Adult Probation, 388 F.3d 539, 542 (6th Cir. 2004). Ms. Jackson's Estate easily clears the first hurdle. As a pretrial detainee, Ms. Jackson had a Fourteen Amendment right to receive medical treatment, and no one seriously argues her symptoms were not serious. As alleged, her symptoms were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Santiago, 734 F.3d at 590. Therefore, the only question is whether the Estate can show the second prong—*i.e.*, a policy or custom of deliberate indifference.

Ordinarily, plaintiffs struggle to muster facts sufficient to show a municipality had a policy or custom of deliberate indifference. Here, however, Ms. Jackson's Estate alleges that in 2021 a senior member of the prison's healthcare staff blew the whistle on QCHC. The whistle-blower did

---

not answer that question" at the motion to dismiss stage. See Osberry v. Slusher, 750 F. App'x 385, 389–99 (6th Cir. 2018).

[5] The subjective component for § 1983 liability can also be established if the plaintiff proves the municipality "knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it." Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 900 (6th Cir. 2004) (quoting Farmer, 511 U.S. at 847); see also Walker v. Stewart Cnty., 2018 WL 4566830, at *3 (M.D. Tenn. Sept. 24, 2018).

7

so by informing county officials that QCHA: (1) routinely failed to order necessary medical tests, (2) failed to follow through with medical testing that had been ordered, (3) left medical treatment to the hands of untrained LPNs, and (4) tolerated medical professionals who failed to treat prisoners in medical distress. Ms. Simmons reported this troubling information about prisoner healthcare at Putnam County Jail to two senior County officials: Major Nash and Sheriff Farris. (Doc. No. 31 ¶¶ 79-82, 91). Rather than investigating Ms. Simmons' claims, Sheriff Farris met with QCHC executives, and they collectively agreed to fire her. (Id. ¶ 91).

At this stage, the Court must grant Ms. Jackson's Estate all reasonable inferences. See Stacy v. Clarksville Police Dep't, 771 F. Supp. 3d 1024, 1043 (M.D. Tenn. 2025). With those reasonable inferences, the Estate has sufficiently alleged the existence of a "custom of tolerance or acquiescence of federal rights violations." Burgess, 735 F.3d at 478. For example, there is a reasonable inference that Sheriff Farris spoke with the County Attorney and/or the Mayor about Ms. Simmons' allegations before deciding how to proceed. It would have been bold for Sheriff Farris to have disregarded Ms. Simmons' serious assertions without consulting other senior county leaders, including legal counsel. It is also reasonable to infer that Sheriff Farris (and other county leaders) disregarded Ms. Simmons' allegations and advocated for her termination because the County wanted to preserve is cost-efficient relationship with QCHC at the expense of prisoner health. Finally, it is reasonable to assume the County's custom of turning a blind eye to QCHC's corner cutting continued long after Ms. Simmons' firing up to the time of Ms. Jackson's death.[6] With these reasonable inferences, the Estate's § 1983 claim can survive the County's motion to

---

[6] One of the most tragic aspects of this case—setting aside the unnecessary loss of a young life—is that Ms. Simmons essentially predicted this tragedy two years before it happened.

dismiss. If discovery proves these inferences wrong, the parties can make appropriate arguments at the summary judgment stage.

Alternatively, the Estate has alleged sufficient facts to show that Sheriff Farris was an "official with final decision-making authority" and he "ratified" QCHC's illegal actions. Burgess, 735 F.3d at 478. Again, it is reasonable to infer that the buck stops with Sheriff Farris concerning the operations of Putnam County Jail. E.g., Templeton v. Brandt, 2021 WL 1312617, at *5 (S.D. Ohio Apr. 7, 2021) ("As Lawless is alleged to be the County Sheriff, he would at least plausibly constitute the 'official with final decision-making authority' for the County as to the law-enforcement activities at issue here."). Because Ms. Simmons informed Sheriff Farris that QCHC was providing subpar health care to prisoners, his subsequent inaction (beyond recommending Ms. Simmons' termination) is a constructive endorsement of ACHC's unlawful practices. These facts, combined with reasonable inferences, are also sufficient to defeat the County's 12(b)(6) motion.

### IV. CONCLUSION

For these reasons, the County's Motion to Dismiss (Doc. No. 37) is **DENIED**.

It also appears the parties have not attended mediation. Because this case begs for a reasonable resolution, the parties are ordered to attend mediation on or before **September 29, 2025**. No less than five days of the date of this memorandum opinion and order, the parties shall select a mediator and select a date for mediation and report same to the Court.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE